UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STEVEN L. VERA          :
and KIM E. VERA,        :
                        :
    Plaintiffs,         :
                        :
v.                      :          Case No. 3:16-cv-72 (RNC)
                        :
LIBERTY MUTUAL FIRE INSURANCE :
CO.,                    :
                        :
    Defendant.          :

RULING AND ORDER

Defendant Liberty Mutual Fire Insurance Company insures the home of plaintiffs Steven and Kim Vera. After defendant denied insurance coverage for damages to the basement walls of the home, plaintiffs brought this action for breach of contract.[1] The parties jointly seek to certify several questions to the Connecticut Supreme Court. For reasons that follow, certification is granted with regard to one of the jointly proposed questions.[2]

---

[1] Plaintiffs also brought claims for breach of the duty of good faith and fair dealing and violations of Connecticut's Unfair Trade Practices Act ("CUTPA") and Unfair Insurance Practices Act ("CUIPA"). These claims will be dismissed in a separate ruling.

[2] Plaintiff seek certification of several additional questions. Plaintiffs' proposed questions will be addressed in a separate ruling.

1

I. Background

The facts bearing on certification are essentially undisputed. Plaintiffs' home in Willington was built in 1993 with concrete supplied by the J.J. Mottes Concrete Co. Many basements built with Mottes concrete in northeastern Connecticut exhibit cracking and other signs of premature deterioration. See generally Roberts v. Liberty Mut. Fire Ins. Co., 264 F. Supp. 3d 394, 400 (D. Conn. 2017) (describing "crumbling foundation" problem). In August 2015, after hearing that some neighbors were experiencing issues with their basements, plaintiffs inspected the unfinished areas of their basement and noticed some cracking.

Plaintiffs retained an engineer, William Neal, who inspected the basement walls and found internal "spider web cracking" and several vertical external cracks. See Neal Report, at 1 (ECF No. 46-3).[3] Mr. Neal's inspection report states that the cracks are caused by Alkali-Silica-Reaction ("ASR"), a chemical reaction between alkaline cement paste and silica contained in concrete aggregates. Id. At the time of his inspection, there were no visible signs of bowing and the home was not in imminent danger of falling down, but the walls were "beginning to lose their structural integrity." Id. The report states that it is "not possible to predict how quickly the foundation will deteriorate

---

[3] Though Mr. Neal did not measure the cracks, he found only one wider than 1/16 of an inch. Id.

2

to the point it is structurally dangerous." Id. However, there "is no way to arrest the process and there is no way to repair the existing damage." Id. In his report, Mr. Neal recommended replacing the basement walls. Id. To date, the walls have not been replaced.

After receiving Mr. Neal's report, plaintiffs filed an insurance claim with defendant on September 4, 2015. Defendant sent an inspector to the home. Following the inspection, defendant denied the claim. The denial letter stated that the policy does "not afford coverage for the cracking to the foundation due to faulty, inadequate or defective materials along with settling." Plaintiffs then filed this suit.

Defendant has retained experts who disagree with Mr. Neal about both the cause of the cracking and the extent of the structural impairment. Engineering experts Carl and Paul Cianci state that the cracking is likely caused by oxidation of the mineral pyrrhotite, not ASR. See Cianci Report, at 4 (ECF No. 46-12). Pyrrhotite oxidizes in the presence of water and oxygen to form expansive secondary minerals. See generally Roberts, 264 F. Supp. 3d at 400. According to the Ciancis, the cracking does not present a "substantial impairment to the structural integrity of a building, as [the walls are] adequately supporting the structure with no immediate concern of imminent collapse." Cianci Report, at 5. Concrete expert Nick Scaglione, who conducted a

petrographic analysis of the concrete, has concluded that the cracking is caused by the presence of pyrrhotite. See Scaglione Report, at 8 (ECF No. 46-11). He states that "the progress of the distress can be arrested by cutting off the source of exterior water to the concrete." Id. at 10.

Mr. Scaglione's identification of pyrrotite as the cause of the cracking is consistent with a December 2016 report on Mottes concrete issued by the State of Connecticut. See Conn. Dep't of Consumer Protection, Report on Deteriorating Concrete in Residential Foundations (Dec. 30, 2016) (ECF No. 46-25) ("CDCP Report"). The report was released after Mr. Neal's inspection of plaintiffs' home, and he has since stated at depositions in other Mottes concrete cases that pyrrhotite, ASR, or both may be the cause of the cracking problem. See Neal Depo., Aug. 17, 2017, at 37 (ECF No. 46-10), Gladysz v. Liberty Mutual Ins. Co., 16-cv-917 (VLB) (D. Conn.).

In relevant part, the insurance policy at issue (ECF No. 46-1) provides the following:

**SECTION I – PROPERTY COVERAGES**

**COVERAGE A – Dwelling**

We cover:

>    (1) The dwelling on the "residence premises" . . . including structures attached to the dwelling . . . .

**ADDITIONAL COVERAGES . . .**

    8. **Collapse.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . .

        b. Hidden decay; . . .

        f. Use of defective material or methods in construction, remodeling or renovation . . .

    Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b., c., d., e., and f. unless the loss is a direct result of the collapse of a building.

    Collapse does not include settling, cracking, shrinking, bulging or expansion. . . .

**SECTION I – PERILS INSURED AGAINST**

**COVERAGE A – DWELLING and COVERAGE B – OTHER STRUCTURES**

We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property. We do not insure, however, for loss:

  1. Involving collapse, other than as provided in Additional Coverage 8.;

  2. Caused by: . . .

    e. Any of the following:

        (1) Wear and tear, marring, deterioration;

        (2) Inherent vice, latent defect, mechanical breakdown;

>           (3) Smog, rust or other corrosion; . . .
>
>           (6) Settling, shrinking, bulging or
>           expansion, including resultant cracking,
>           of pavements, patios, foundations, walls,
>           floors, roofs or ceilings; . . .
>
>      3. Excluded under Section I – Exclusions.
>
>      **SECTION I – EXCLUSIONS** . . .
>
>      2. We do not insure for loss to property described in
>      Coverages A and B caused by any of the following.
>      However, any ensuing loss to property described in
>      Coverages A and B not excluded or excepted in this
>      policy is covered. . . .
>
>           c. **Faulty, inadequate or defective**: . . .
>
>                (2) Design, specifications, workmanship,
>                repair, construction, renovation, remodeling,
>                grading, compaction;
>
>                (3) Materials used in repair, construction,
>                renovation or remodeling; . . .

II. <u>Legal Standard</u>

The Second Circuit has "long recognized that state courts should be accorded the first opportunity to decide significant issues of state law through the certification process, and that, especially where the issues implicate the weighing of policy concerns, principles of comity and federalism strongly support certification." The Cadle Co. v. Fletcher, 804 F.3d 198, 202 (2d Cir. 2015). Under Connecticut law, the "Supreme Court may answer a question of law certified to it by a court of the United States

6

. . . if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state." Conn. Gen. Stat. § 51-199b(d). In deciding whether to certify a question, courts should consider: "(1) the absence of authoritative state court decisions; (2) the importance of the issue to the state; and (3) the capacity of certification to resolve the litigation." O'Mara v. Town of Wappinger, 485 F.3d 693, 698 (2d Cir. 2007).

III. Discussion

The parties jointly seek to certify several questions related to the collapse provision found in clause 8 of the Additional Coverages section of the policy. The only plausible basis for coverage under the insurance policy is this provision.[4] I agree with the parties that the following jointly proposed question warrants certification: What constitutes "substantial impairment of structural integrity" for purposes of applying the collapse provision? I decline to certify the other proposed questions.

The first jointly proposed question asks whether the definition of "collapse" provided in Beach v. Middlesex Mut. Assur. Co., 205 Conn. 246, 251, 532 A.2d 1297, 1300 (1987) - "substantial impairment of structural integrity" - applies to the

---

[4] Other proposed bases for coverage will be addressed in a separate ruling.

collapse provision here. I agree with Judge Underhill that the Beach standard applies. See Karas v. Liberty Ins. Corp., No. 3:13-CV-01836 (SRU), 2018 WL 2002480, at *4 (D. Conn. Apr. 30, 2018). Therefore, this question will not be certified.

The second proposed question asks how the Beach standard applies to the collapse provision in the policy at issue. I agree that this question warrants certification for substantially the reasons recently stated by Judge Underhill in Karas, a case involving the same policy language. See id. at 4-5.

Since Beach, no Connecticut appellate court has explained what "substantial impairment of structural integrity" means, and the facts of Beach offer little guidance when, as in this case, the existing damage to a structure is less extensive than the damage in Beach. The house in Beach had not caved in and remained inhabitable, but the foundation had a large, nine-inch wide crack; it was separated from the bottom of the building wall; and parts of it later fell into the basement and were no longer supporting the house. See 205 Conn. at 247-48. In that factual context, the Court held that an insured need not show a "sudden and catastrophic" caving in to show a "collapse." Id. at 252. Short of similarly extensive damage, however, it is not clear how "substantial" an impairment needs to be to constitute "collapse."

Insureds have prevailed in the vast majority of Mottes concrete cases controlled by Beach, but there is disagreement

8

about how the Beach standard applies. Some courts have held (or assumed) that once an insured presents expert evidence that a foundation's structural integrity is impaired, it is for the jury to decide whether the impairment is "substantial." See Metsack v. Liberty Mut. Fire Ins. Co., No. 3:14-CV-01150 (VLB), 2017 WL 706599, at *6 (D. Conn. Feb. 21, 2017); Jang v. Liberty Mut. Fire Ins. Co., No. 3:15-CV-1243 (JBA), 2018 WL 1505574, at *2 (D. Conn. Mar. 27, 2018); Belz v. Peerless Ins. Co., 204 F. Supp. 3d 457, 464 (D. Conn. 2016); Roy v. Liberty Mut. Fire Ins. Co., No. 15-6009410-S, 2017 Conn. Super. LEXIS 506, at *17 (Conn. Super. Feb. 22, 2017). Others have attempted to further define the phrase, but there does not appear to be a consensus definition. Relying on language in Beach, Judge Underhill has ruled that impairment of structural integrity is "substantial" when "a building 'would have caved in had the plaintiffs not acted to repair the damage.'" Roberts, 264 F. Supp. 3d at 407 (quoting 205 Conn. at 249). Other courts, mostly outside Connecticut, have embraced differing standards, including "imminent danger," "abandonment," or "unfit for its function or unsafe." See id. at 406 (collecting cases).

The facts of Beach suggest that an "unsafe" standard is inapplicable under Connecticut law because the house in that case remained inhabitable. See id. (rejecting standard from Queen Anne Park Homeowners Ass'n v. State Farm Fire & Casualty Co., 183 Wash. 2d 485 (2015) as inconsistent with Beach). An imminence

9

requirement may be appropriate, however, and the present case provides a vehicle for the Supreme Court to decide the issue. An imminence requirement "avoids both the absurdity of requiring an insured to wait for a seriously damaged building to fall and the improper extension of coverage that would convert the policy into a maintenance agreement." KAAPA Ethanol, LLC v. Affiliated FM Ins. Co., 660 F.3d 299, 306 (8th Cir. 2011) (quotations omitted). This latter concern is particularly salient here, where the walls are - according plaintiffs' own expert - only "*beginning* to lose their structural integrity." Moreover, as Judge Underhill has observed, insurance coverage in Mottes concrete cases is an important issue of public policy, with many currently pending cases and many more likely to be filed. See Karas, 2018 WL 2002480, at *2.

The parties also seek certification of a question based on the following exclusion within the collapse provision: "Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not [covered] unless the loss is a direct result of the collapse of a building." Many insurers in Mottes concrete cases have argued that this exclusion applies because the typical "loss" to the "foundation" or "retaining wall" is not a "direct result" of the "collapse of a building"; rather, it is the basement walls themselves that have allegedly "collapsed." See, e.g., Bacewicz v. NGM Ins. Co., No.

10

3:08-CV-1530 (JCH), 2010 WL 3023882, at *3-4 (D. Conn. Aug. 2, 2010). Courts have consistently held that this provision does not exclude coverage in Mottes concrete cases because the terms "foundation" and "retaining wall" are ambiguous. See Karas, 2018 WL 2002480, at *4 (collecting cases); see also Lexington Ins. Co. v. Lexington Healthcare Grp., Inc., 311 Conn. 29, 37, 84 A.3d 1167, 1173 (2014) ("[A]ny ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy."). I agree that the terms are ambiguous.[5]

Defendant argues that it should be able to offer extrinsic evidence showing that the plaintiffs understood their basement walls to be the "foundation" of their home. As defendant notes, the general rule is that "[i]f the policy is ambiguous, extrinsic evidence may be introduced to support a particular interpretation." Metro. Life Ins. Co. v. Aetna Cas. & Sur. Co., 255 Conn. 295, 305-06 (2001).[6] However, the general rule applies

---

[5] In finding these terms ambiguous, most cases cite alternative dictionary definitions that do not encompass basement walls. See, e.g., Karas v. Liberty Mutual Ins. Corp., 33 F. Supp. 3d 110, 115-16 (D. Conn. 2014) (noting that "foundation" can refer to footing under basement walls, and "retaining wall" can refer to freestanding wall that prevents erosion). As Judge Underhill has pointed out, the exclusions are located in a section of the policy that excludes items found outside a building. See Karas, 2018 WL 2002480, at *4 n.6 (quoting Roy, 2017 Conn. Super. LEXIS 506, at *19).

[6] To my knowledge, no court construing the policy language at issue here has examined extrinsic evidence. See Jang, 2018 WL 1505574, at *3 (mentioning extrinsic evidence rule but not discussing extrinsic evidence); Bacewicz, 2010 WL 3023882, at *3-

only "when the ambiguity in the policy is based upon a factual determination." Lexington Ins. Co., 311 Conn. at 77, 84 A.3d at 1195 (Eveleigh, J., concurring in part and dissenting in part) (citing Israel v. State Farm Mut. Auto. Ins. Co., 259 Conn. 503, 512, 789 A.2d 974, 974 (2002)). When the "ambiguity in the policy is inherent in the terms of the policy," the language is construed against the insurer without examination of extrinsic evidence. Id. Here, the ambiguities arise from alternative definitions of the policy terms and the context in which they appear. Thus, the ambiguities are "inherent" in the policy, making examination of extrinsic evidence inappropriate. Cf. R.T. Vanderbilt Co. v. Cont'l Cas. Co., 273 Conn. 448, 464, 870 A.2d 1048, 1059 (2005) (finding term ambiguous after review of dictionary definitions and construing term against insurer without considering extrinsic evidence).

IV. Conclusion

Pursuant to Conn. Gen. Stat. § 51-199b(d), I hereby certify the following question to the Connecticut Supreme Court:

> What constitutes a "substantial impairment of structural integrity" for purposes of applying the "collapse" provision of this homeowners' insurance policy?

Of course, consistent with Conn. Gen. Stat. § 51-199b(e), the

---

4 (same); Metsack, 2017 WL 706599, at *6 (no mention of extrinsic evidence); Gabriel v. Liberty Mut. Fire Ins. Co., No. 3:14-cv-1435 (VAB), 2017 WL 6731713, at *8 (Dec. 29, 2017) (same); Karas, 33 F. Supp. 3d at 115 (D. Conn. 2014) (same); Belz v. Peerless Ins. Co, 46 F. Supp. 3d 157, 166 (D. Conn. 2014) (same).

Supreme Court may reformulate this question and add any additional questions it deems appropriate.  In addition, I will make available any part of the record that the Court requires.  <u>See</u> <u>id.</u> § 51-199b(f).  The names and addresses of counsel of record are as follows.  The plaintiffs are represented by: Brian D. Danforth, P.O. Box 676, Ellington, CT 06029.  The defendant is represented by: Philip T. Newbury & Kieran W. Leary, 65 Weathersfield Ave., Hartford, CT 06114-1190.

So ordered this 15th day of June 2018.

/s/
Robert N. Chatigny
United States District Judge